1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  DAVID W. MITCHELL (199706)
   BRIAN O. O'MARA (229737)
3  LONNIE A. BROWNE (293171)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone: 619/231-1058
   619/231-7423 (fax)
6  davidm@rgrdlaw.com
   bomara@rgrdlaw.com
7  lonnieb@rgrdlaw.com

8  Attorneys for Plaintiff

9  [Additional counsel appear on signature page.]

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

| 13  NECA-IBEW WELFARE TRUST FUND, | ) | Case No. |
| Individually and on Behalf of All Others | ) | |
| Similarly Situated, | ) | CLASS ACTION |

14

15                    Plaintiff,    COMPLAINT FOR VIOLATION OF STATE
                                     ANTITRUST AND/OR UNFAIR AND
16          vs.                      DECEPTIVE TRADE PRACTICES ACTS
                                     AND THE SHERMAN ANTITRUST ACT
17  ENDO HEALTH SOLUTIONS INC.,
    TEIKOKU PHARMA USA, INC., TEIKOKU
18  SEIYAKU CO., LTD, ACTAVIS PLC and
    WATSON LABORATORIES, INC.,

19                    Defendants.    DEMAND FOR JURY TRIAL

20

21

22

23

24

25

26

27

28

Plaintiff NECA-IBEW Welfare Trust Fund ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action for damages and relief against defendants Endo Health Solutions Inc. (f/k/a Endo Pharmaceuticals Inc.) ("Endo"), Teikoku Pharma USA, Inc. ("Teikoku Pharma"), Teikoku Seiyaku Co., Ltd. ("Teikoku Seiyaku," and together with Teikoku Pharma "Teikoku," and collectively with Endo, "Endo/Teikoku"), and Watson Laboratories, Inc. and Actavis plc (f/k/a Watson Pharmaceuticals, Inc.) (collectively, "Watson") (and together with Endo/Teikoku, the "Defendants"), for violations of state antitrust and/or unfair and deceptive trade practices acts, for unjust enrichment and for violations of the federal antitrust laws, the Sherman Antitrust Act ("Sherman Act") and the Clayton Antitrust Act ("Clayton Act"). Based on counsel's investigation, research and review of publicly available documents, on Plaintiff's personal knowledge, and upon information and belief, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1. Defendants conspired to unlawfully delay and exclude less expensive generic versions of Lidoderm – a brand-name prescription pharmaceutical sold by Endo – from entering the market. Plaintiff brings this action for damages and declaratory and injunctive relief on behalf of a proposed Class of end-payors (as defined below) who indirectly purchased, reimbursed, or otherwise paid for Lidoderm, other than for resale.

2. Lidoderm is a prescription medication comprised of an anesthetic adhesive patch containing 5% lidocaine used to relieve pain associated with post-herpetic neuralgia, known as after-shingles pain. In collaboration with Teikoku, Endo launched Lidoderm in the United States in 1999 after it was approved by the Food and Drug Administration (the "FDA"). Lidoderm became hugely successful, generating $1.4 billion in U.S. sales for the twelve months ending May 31, 2013.

3. Defendants' anticompetitive conduct consists of three basic components, including: (1) improperly listing and/or maintaining the listing of U.S. Patent No. 5,827,529 (the "'529 patent"), which does not cover Lidoderm, in the book of "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly referred to as the "Orange Book"; (2) commencing and pursuing baseless patent litigation against generic manufacturers; and (3) entering into an unlawful agreement not to compete in the market for Lidoderm.

4.      First, Teikoku wrongfully listed and/or maintained the listing of the '529 patent in the Orange Book as related to Lidoderm. But Teikoku knew by at least 2003 that the '529 patent did not actually claim Lidoderm or a method of using Lidoderm. By listing and maintaining the '529 patent in the Orange Book, Teikoku knew that it would force any generic manufacturer seeking approval to market a generic version of Lidoderm before the patent expired to file a certification with the FDA that the patent was invalid or would not be infringed. Teikoku knew and intended that such a filing would trigger Endo and Teikoku's ability to file infringement litigation, which in turn would trigger an automatic statutory delay of 30 months under the Hatch-Waxman Act for approval of any such generic's abbreviated new drug application ("ANDA") by the FDA.

5.      Second, when Watson submitted an application to the FDA for approval to market a generic version of Lidoderm, Endo and Teikoku commenced baseless patent infringement litigation against Watson. The litigation was objectively baseless because no reasonable litigant would have realistically expected success on the merits. Endo and Teikoku commenced and maintained the litigation solely to delay approval of generic versions of Lidoderm.

6.      Third, in furtherance of, and as part of, the anticompetitive scheme, Endo and Teikoku entered into a non-competition agreement with Watson, agreeing to pay Watson substantial sums in exchange for Watson's agreement to delay marketing its less expensive generic version of Lidoderm for over a year, i.e., until September 15, 2013 (the "Agreement"). Watson thereby joined the anticompetitive scheme as a co-conspirator. Watson did, in fact, delay marketing its less-expensive generic version of Lidoderm.

7.      Finally, as part of the Agreement, Endo and Teikoku promised not to launch an authorized generic version of Lidoderm to compete with Watson's generic Lidoderm for seven-and-a-half months after Watson launched its generic.

8.      Absent Defendants' anticompetitive conduct, one or more generic versions of Lidoderm would have been marketed in the United States as early as May 2012, and Plaintiff and members of the Class would have been able to purchase Lidoderm at significantly lower prices, rather than being forced to pay for branded Lidoderm at higher prices as a result of the illegal

1  scheme. Lidoderm sales for the twelve months ending March 31, 2012 were approximately $1.2

2  billion.

3         9.     Defendants' anticompetitive scheme was designed to and did in fact: (1) delay and/or

4  prevent the entry of less expensive generic versions of Lidoderm from entering the market in the

5  United States; (2) delay the introduction of an authorized generic version of Lidoderm, which

6  otherwise would have appeared on the market at a significantly earlier time; (3) fix, raise, maintain

7  or stabilize the prices of Lidoderm products; (4) permit Endo/Teikoku to maintain a monopoly in the

8  United States for Lidoderm; and (5) allocate 100% of the U.S. Lidoderm market to Endo/Teikoku.

9        10.     As alleged in more detail below, Defendants violated §1 and §2 of the Sherman Act

10  and the state laws enumerated below through their anticompetitive scheme to improperly maintain

11  and extend their market and monopoly power by foreclosing or delaying competition from lower-

12  priced generic versions of Lidoderm

13                                                  **JURISDICTION AND VENUE**

14        11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because

15  this is a class action involving common questions of law or fact in which the aggregate amount in

16  controversy exceeds $5,000,000, there are more than one hundred members of the Class, and at least

17  one member of the putative Class is a citizen of a state different from that of one of the Defendants.

18        12.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and

19  1337 in that Plaintiff brings claims under §16 of the Clayton Act, 15 U.S.C. §26, for injunctive and

20  equitable relief to remedy Defendants' violations of §§1 and 2 of the Sherman Act, 15 U.S.C. §§1-2.

21  The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28

22  U.S.C. §1367.

23        13.     Venue is proper in this Court under §12 of the Clayton Act, 15 U.S.C. §22, and 28

24  U.S.C. §1391, because Defendants transact business in this District, and a substantial part of the

25  interstate trade and commerce involved and affected by the violations of the antitrust laws was and is

26  carried on in part within this District. The acts complained of have and will continue to have

27  substantial effects in this District.

28

# PARTIES

**Plaintiff**

14.    Plaintiff NECA-IBEW Welfare Trust Fund (the "Fund") provides health and welfare coverage for its participants and their dependents. The Fund acts as a customer for its beneficiaries and their dependents and purchases services, including medical services, vision services and prescription drug care. Plaintiff purchased and provided reimbursement for Lidoderm, other than for re-sale, at supracompetitive prices during the Class Period, and has thereby been injured. Plaintiff is located in Decatur, Illinois.

**Defendants**

15.    Defendant Endo is a Delaware corporation, having its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19353. Endo was formerly known as Endo Pharmaceuticals Inc. until February 2012, when the company announced the aggregation of its operating companies as part of an enterprise-wide branding initiative and changed its name to Endo Health Solutions Inc. Endo markets and sells Lidoderm throughout the United States.

16.    Defendant Teikoku Pharma is a California corporation, having its principal place of business at 1718 Ringwood Avenue, San Jose, California 95131. Teikoku Pharma is a wholly-owned subsidiary of Teikoku Seiyaku, and is the holder of the New Drug Application for Lidoderm.

17.    Defendant Teikoku Seiyaku is a company organized and existing under the laws of Japan, having its principal place of business at 567 Sanbonmatsu, Higashikagawa, Kagawa 769-2695, Japan. Teikoku Seiyaku is the owner, assignee or licensee of the '529 patent over which Endo and Teikoku sued Watson. Teikoku Seiyaku manufactures Lidoderm in Japan for commercial sale in the United States by Endo under a Manufacturing and Supply Agreement with Endo. Endo pays Teikoku Seiyaku royalties under that agreement.

18.    Actavis plc is incorporated under the laws of Ireland, with its principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland and a place of business in Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc. as a result of Watson Pharmaceuticals, Inc.'s

1 acquisition of Swiss-based Actavis Group on or around October 2012. On or about October 1, 2013,
2 Actavis Inc. changed its name to Actavis plc.

3      19. Defendant Watson Laboratories, Inc. is a Nevada corporation, having its principal
4 place of business at 311 Bonnie Circle, Corona, California 92880. Defendant Watson Laboratories,
5 Inc. is a wholly-owned subsidiary of Actavis plc.

6      20. Actavis plc and Watson Laboratories, Inc. are collectively referred to herein as
7 "Watson." Watson is engaged in the worldwide marketing, production and distribution of generic
8 pharmaceutical products.

9      21. All of Defendants' actions described in this complaint are part of, and were in
10 furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by
11 Defendants' various officers, agents, employees, or other representatives while actively engaged in
12 the management of Defendants' affairs (or that of their predecessors-in-interest) within the course
13 and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible
14 authority of Defendants.

15      22. With respect to all of the conduct complained of below, at all relevant times Endo
16 acted in concert with the Teikoku.

17                **INTERSTATE AND INTRASTATE COMMERCE**

18      23. At all material times, Endo/Teikoku manufactured, promoted, distributed, and sold
19 substantial amounts of Lidoderm in a continuous and uninterrupted flow of commerce across state
20 and national lines and throughout the United States.

21      24. At all material times, Defendants transmitted funds as well as contracts, invoices and
22 other forms of business communications and transactions in a continuous and uninterrupted flow of
23 commerce across state and national lines in connection with the sale of Lidoderm.

24      25. In furtherance of their efforts to monopolize and restrain competition in the market
25 for Lidoderm products, Defendants employed the United States mails and interstate and international
26 telephone lines, as well as means of interstate and international travel. The activities of Defendants
27 were within the flow of and have substantially affected interstate commerce.

28

26.     Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, retailers within each state are foreclosed from offering less expensive generic Lidoderm to end-payors inside each respective state. The foreclosure of generic Lidoderm directly impacts and disrupts commerce for end-payors within each state.

## FACTUAL ALLEGATIONS

### Regulatory Framework and Industry Background

27.     A brand name pharmaceutical manufacturer seeking approval from the FDA under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§301-392) ("FDCA") must obtain the FDA's approval to sell the new drug by filing a New Drug Application ("NDA"). The NDA details safety and efficacy studies conducted on the brand-name drug, the components of the drug, the methods used in the "manufacture, process and packaging of the drug," and any patents issued on the composition or methods of using the drug. The FDA publishes the patent information in the Orange Book.

28.     In 1984, Congress amended the FDCA with the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984), known as the Hatch-Waxman Act. The Hatch-Waxman Act permits a generic pharmaceutical manufacturer to file an ANDA with the FDA prior to the expiration of, and without infringing on, the brand-name manufacturer's patent. This allows generic manufacturers to avoid the more costly process of filing an NDA and conducting time-consuming studies when seeking to enter into the market a generic version of a pharmaceutical already listed in the Orange Book. It also allows the generic manufacturer to rely on the brand-name manufacturer's previous research and the FDA's determination concerning the brand-name pharmaceutical's safety.

29.     Under the Hatch-Waxman Act, an ANDA requires that a generic manufactured drug has the "same active ingredients as," and is "biologically equivalent" to, the FDA-approved brand-name drug. Additionally, a generic manufacturer must ensure in its ANDA that the generic drug will not infringe the brand-name manufacturer's patent. It can do so by making one of the following four certifications: (1) that the brand-name manufacturer has not filed any relevant patent; (2) that a patent on the brand-name drug has expired; (3) that a brand-name patent exists but that it would not

market any generic drug until the still-in-force patent expires; or (4) that the "patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted."

30. Generic companies often challenge a patent under the fourth option, known as a "Paragraph IV Certification." Taking this route is deemed an act of patent infringement and can trigger brand-name manufacturers to institute patent litigation against the generic challenger. If the brand-name manufacturer brings an infringement suit within 45 days of receiving notice of the Paragraph IV Certification, the FDA then must withhold approving the generic, usually for a 30-month period, while the parties litigate patent validity or infringement in court. If the courts decide the matter within that period, the FDA follows that determination; if they do not, the FDA may go forward and give approval to market the generic product. Thus, the brand-name manufacturer has the opportunity to delay final approval of the generic manufacturer's ANDA and ultimately the sale of the competing generic drug simply by filing patent litigation within the 45-day period specified in the Hatch-Waxman Act.

31. To incentivize challenges to patents of "pioneer" drugs, the first generic pharmaceutical manufacturer to file an ANDA with a Paragraph IV Certification obtains 180 days of exclusivity from the first commercial marketing of its drug during which no other generic manufacturer can compete with the brand-name drug. If the first-to-file generic manufacturer can overcome any patent hurdles and successfully bring the generic drug to the market, this exclusivity period can generate hundreds of millions of dollars in profits for the company as it solicits business away from the brand-name manufacturer with lower prices.

32. As manufacturers of generic drugs typically price their versions of brand-name drugs substantially below the brand-name price, once generics are available pharmacists tend to generously substitute generic versions for their brand-name counterparts whenever substitution is legally permissible. Once the 180-day exclusivity period ends and additional manufacturers start selling competing generic versions of the once-exclusive brand-name drug, prices for generic versions of the drug predictably decrease even further because of competition among the generic manufacturers, and the loss of sales volume by the brand-name drug to the corresponding generic drugs accelerates.

33.     Virtually all states encourage, and some require, pharmacists to substitute an AB-rated[1] generic drug for its corresponding brand-name drug unless the doctor has stated that the prescription for the brand-name product must be dispensed as written.  In other words, pharmacists generally need not seek or obtain permission from the prescribing doctor before substituting an AB-rated generic for a brand-name drug.  Additionally, many third-party payors (such as health insurance plans and Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their brand-name counterparts.  Moreover, many consumers routinely switch from a brand-name drug to an AB-rated generic drug once the generic becomes available in order to save on out-of-pocket expenses for their prescriptions.  Consequently, AB-rated generic drugs typically capture a significant share of their brand-name counterparts' sales, causing a rapid and significant reduction of the brand-name drug's unit and dollar sales.

34.     Once a generic equivalent enters the market, it captures 80% of sales of the brand-name drug on average within the first six months, and once multiple generic manufacturers enter the picture, the generic equivalents can sell for as much as 80%-85% less than the brand-name drug. Generic competition not only lowers the price to purchasers of generic versions of a brand-name drug, but it also reduces the price to purchasers of the brand-name drug.  Until a generic manufacturer enters the market, however, there is no bioequivalent generic drug to compete with the brand-name drug, and therefore the brand-name manufacturer can continue to profit from supracompetitive pricing without losing its brand-name sales.  Consequently, brand-name drug manufacturers have a strong incentive to use various tactics to delay the introduction of generic competition into the market.

35.     As explained in its 10-K filed on February 28, 2011, Endo had a lot to lose from the introduction of a generic version of Lidoderm: Lidoderm sales made up 46%, 52% and 61% of the company's total revenues in 2010, 2009 and 2008, respectively – by far the company's largest source of revenue in each of those three years.  In 2011 and 2012, Lidoderm continued to be Endo's principle source of revenue with sales of $825 and $947 million, respectively, accounting for about

---

[1]   An "AB-rated" generic drug is a drug that has been proven to meet the necessary bioequivalence requirements established by the FDA.

30% of its total revenues in 2011 and 34% of its total revenues in 2012. As the company explained, "If we are unable to continue to market any of our products, if any of them were to lose market share, for example, as the result of the entry of new competitors, particularly from generic versions of branded drugs, or if the prices of any of these products were to decline significantly, our total revenues, profitability and cash flows would be materially adversely affected." And presumably, Endo would have had the most to lose from a reduced market share of its most important product, Lidoderm.

**The Rise and Development of Pay-For-Delay Settlements**

36.     Given that under the Hatch-Waxman Act brand-name manufacturers can automatically obtain a two-and-a-half year stay of FDA approval of an ANDA with a Paragraph IV Certification by initiating a patent infringement suit against the generic manufacturer, brand-name manufacturers often sue generic manufacturers simply to delay generic competition, rather than to enforce valid patents against infringing products. Accused infringers have been successful in patent cases brought against them. Studies have shown that generic manufacturers who file an ANDA with a Paragraph IV Certification and are subsequently sued by the brand-name manufacturer enjoy up to a 75% success rate fighting the patent infringement suit.

37.     With millions, and sometimes even billions, of dollars at stake, instead of doubling down on the validity of their patents, brand-name manufacturers have devised agreements variously called reverse payment, exclusion payment, or pay-for-delay settlements that induce generic manufacturers to refrain from entering into the market and split inflated monopoly profits with generic manufacturers, thereby settling the patent infringement litigation and protecting future brand-name profits from generic competition. The pay-for-delay settlement essentially transfers wealth from consumers to drug makers, in the form of continued high pharmaceutical prices, with brand-name manufacturers sharing a portion of that transfer with the generic manufacturer.

38.     These agreements not only delay market entry of the first generic applicant, but also the market entry of all other generic manufacturers. By agreeing not to begin marketing a generic drug, the first generic applicant thereby delays the start of the 180-day period of generic market exclusivity. This tactic creates a "bottleneck," because later generic applicants cannot launch their

generic versions of the product until the first generic applicant's 180-day exclusivity has elapsed or is forfeited.

39. In the wake of increased antitrust scrutiny by the Federal Trade Commission ("FTC"), Department of Justice ("DOJ"), and others, brand and generic manufacturers have devised more sophisticated and creative arrangements to disguise the reverse payment agreements. For example, in one common type of arrangement, which often takes the form of a side deal, the generic manufacturer contributes, in addition to delayed market entry, some further value that can take the form of a wide range of product development, manufacturing and/or promotional services. These side deals provide an opportunity to overstate the value of the contributions from the generic manufacturer and claim that the cash provided by the brand-name manufacturer is consideration for the contributed value, rather than in exchange for delayed entry.

40. In another type of arrangement, the brand-name manufacturer will refrain from marketing its own generic alternative to the brand-name drug, and instead agrees to allow the generic manufacturer to sell an "authorized generic" version of the brand-name drug during the 180-day period. Because brand-name manufacturers have already obtained FDA approval to sell their brand-name drugs, they are free to launch authorized generics during the first-filer's 180-day exclusivity window in an effort to recapture some of the monopoly profits that are inherently lost by the generics' market entry. But brand-name manufacturers often forego the lucrative practice of marketing an authorized generic by entering into an agreement with the first-filer generic manufacturer whereby compensation to the generic manufacturer is buried in the discounted price offered by the brand-name manufacturer and the fact that the brand-name manufacturer has agreed not to launch its own competing authorized generic.

41. A recent FTC study found that authorized generics marketed and sold by brand-name manufacturers capture a significant portion of sales, reducing the first-filer generic manufacturer's revenues by approximately 50% on average during the 180-day exclusivity period. Thus, the brand-name manufacturer's agreement not to launch an authorized generic has tremendous value to the generic manufacturer given the significant negative effect of an authorized generic on the first-filing generic manufacturer's revenues. Although first-filing generic manufacturers make significantly less

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE
TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 10 -

1 money when they must compete with an authorized generic during the first 180 days, consumers and
2 other drug purchasers such as Plaintiff and the Class benefit from the lower prices resulting from
3 competition between the authorized generic and the first-filing generic.

4      42. Senator Orrin Hatch, for whom the Hatch-Waxman Act was named and who was
5 instrumental in its development, made the following comments in congressional hearings regarding
6 these pay-for-delay agreements: "*As a coauthor, I can tell you that I find these type of reverse*
7 *payment collusive arrangements appalling . . . . We did not wish to encourage situations where*
8 *payments were made to generic firms not to sell generic drugs and not to allow multisource*
9 *generic competition.*"

10 **Brand Lidoderm Approval and the Relevant Patents**

11      43. Lidoderm is an anesthetic adhesive patch used to relieve pain associated with post-
12 herpetic neuralgia. Post-herpetic neuralgia, or after-shingles pain, is a complication of shingles,
13 which is caused by the chickenpox (herpes zoster) virus. Most cases of shingles clear up within a
14 few weeks, but if the pain lasts long after the shingles rash and blisters have disappeared, it is called
15 post-herpetic neuralgia. Lidoderm contains 5% lidocaine, which is applied to a non-woven polyester
16 felt backing and covered with a polyethylene terephthalate film release liner. The liner is then
17 released prior to applying the patch to the skin.

18      44. In November 1998, Hind Health Care, Inc. ("Hind") granted Endo the exclusive right
19 to market, develop, use, promote and sell Lidoderm in the United States. On March 19, 1999, the
20 FDA approved NDA 20-612, submitted by Hind, which sought to market an adhesive patch
21 containing 5% lidocaine under the brand name Lidoderm for the treatment of pain associated with
22 post-herpetic neuralgia. Lidoderm was awarded Orphan Drug Exclusivity by the FDA, meaning that
23 no generic competitor could get FDA approval for generic Lidoderm until March 2006. Hind
24 subsequently transferred full ownership of and responsibility for the Lidoderm NDA to Teikoku
25 Pharma, effective June 1, 1999. Endo launched Lidoderm in the United States in 1999.

26      45. Endo and Teikoku owned or obtained assignments of or licenses to numerous patents
27 associated with Lidoderm.

28

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE
TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

46. Teikoku subsequently listed several patents in the Orange Book as covering Lidoderm. As of January 2010, when Watson filed ANDA No. 20-675, which was the first filed ANDA as to Lidoderm, Teikoku had three patents listed in the Orange Book. The first was U.S. Patent No. 5,411,738 (the "'738 patent"), which is a method-of-use patent for treating certain types of pain with lidocaine using a topical delivery mechanism and a gel formulation of lidocaine. The second was U.S. Patent No. 5,601,838 ("the '838 patent"), which is a method-of-use patent for treating certain types of pain with lidocaine. The '738 and '838 patents were both assigned to Hind, both expired on May 2, 2012, and are referred to collectively herein as the "Hind patents." The third was the '529 patent, which is a formulation patent for a lidocaine patch. This patent was assigned to Teikoku, and is set to expire on October 17, 2015. Watson did not challenge the Hind patents. Instead, according to Endo's November 2, 2010 10-Q, Watson filed a Paragraph III Certification as to the Hind patents, meaning it would not market any generic Lidoderm until after the Hind patents expired. As a result, the FDA could not approve Watson's ANDA for generic Lidoderm until the Hind patents expired on May 2, 2012.

47. Endo subsequently obtained additional patents from LecTec Corporation ("LecTec") that it and Teikoku claim cover Lidoderm. In July 2008, LecTec had filed patent infringement litigation against Endo and other manufacturers of medicinal patch products in the United States District Court for the Eastern District of Texas (the "LecTec Litigation") over U.S. Patent No. 5,536,263 (the "'263 patent") and U.S. Patent No. 5,741,510 (the "'510 patent"), both of which are patents for a medicinal adhesive patch. Each of these patents expires on March 30, 2014. Endo settled the litigation in November 2009 with LecTec by paying LecTec $23 million in exchange for exclusive licenses to the '263 and '510 patents for use in the field of prescription pain medications and treatment.

48. Almost a year later, in or about October 2010, Endo granted Teikoku a sublicense under the '510 patent to make and sell prescription pain medications that contain 5% lidocaine in patch dosage form, including Lidoderm. Shortly after October 2010, Teikoku submitted the '510 patent to the FDA for listing in the Orange Book with respect to Lidoderm. As of January 2011,

Endo/Teikoku had four patents listed in the Orange Book related to Lidoderm: the two Hind patents, the '529 patent and the '510 patent.

49.     In or about May 2011, in exchange for $2 million, Endo acquired from LecTec full title to the '263 patent, the '510 patent and three other patents. The three other patents were: U.S. Patent No. 6,096,333 (the "'333 patent"); (ii) U.S. Patent No. 6,096,334 (the "'334 patent"); and (iii) U.S. Patent No. 6,361,790 (the "'790 patent") (collectively with the '263 and the '510 patents, "the Rolf patents," named for one of the inventors). These three patents cover methods of formulating a medicinal adhesive patch. Other than the '510 patent, none of the Rolf patents has been listed in the Orange Book with respect to Lidoderm.

**Watson's ANDA and Endo's Citizen Petition**

50.     On or about January 14, 2010, Watson notified Teikoku that it had filed ANDA No. 20-675, seeking to market a generic version of Lidoderm. Watson's notice letter included a Paragraph IV Certification that the commercial manufacture, use and/or sale of its generic Lidoderm product would not infringe any claim of the '529 patent, and/or that the '529 patent was invalid and/or unenforceable. Watson made no certification to any of the Rolf patents because, as of January 2010, the Rolf patents were not listed in the Orange Book.

51.     Federal regulations governing the FDA create a mechanism by which a person may file a petition with the FDA requesting, among other things, that the agency take, or refrain from taking, any form of administrative action. This mechanism is commonly referred to as a citizen petition. 21 C.F.R.§10.30. The FDA regulations concerning citizen petitions in effect at the relevant time required the FDA Commissioner to respond to each citizen petition within 180 days of receipt.

52.     The citizen petition process has been subject to misuse and abuse by many brand-name manufacturers as a tactic to extend their monopolies on certain brand drugs. Often citizen petitions by brand-name companies seeking to delay approval of generic ANDAs fail to raise legitimate concerns about the safety or efficacy of generic products, but instead seek to preserve monopolies after the end of a statutorily granted patent or FDA exclusivity period. Final approval of a pending ANDA is often delayed for several months, or even years, while the FDA evaluates the citizen petition.

53. In December 2006, Endo submitted a citizen petition to the FDA challenging an October 2006 FDA letter setting forth the FDA's recommended methodology for demonstrating bioequivalence to Lidoderm. Endo subsequently amended its petition in August 2007 and March 2012. On August 23, 2012, the FDA denied Endo's petition and approved Watson's ANDA.

54. The stakes were so high for Endo that in 2012 the company even attempted to make an end run around the FDA and lobbied Congress to force the FDA to develop and adopt a new, more expensive and more time-consuming protocol to establish the bioequivalence of generic versions of Lidoderm.

**The '529 Patent Litigation**

55. On February 19, 2010, Endo and Teikoku filed suit against Watson in the United States District Court for the District of Delaware, alleging that Watson's generic Lidoderm product would infringe the '529 patent (the "'529 Litigation"). As a result of the filing of the '529 Litigation, the 30-month stay was applied to Watson's ANDA, precluding the FDA from approving Watson's ANDA until July 2012.

56. As explained more fully below, the '529 Litigation was objectively baseless, and no reasonable litigant would, or could, have believed it could succeed on the merits, for various independent reasons. First, as Watson explained in responding to Endo/Teikoku's claims that Watson's generic Lidoderm would infringe the '529 patent, the '529 patent is invalid as anticipated and/or obvious in view of numerous pieces of prior art, which were not disclosed to the Patent and Trademark Office ("PTO"), and Endo and Teikoku knew it.[2] Second, the '529 patent did not cover Lidoderm, and Endo and Teikoku knew that Watson's generic Lidoderm would not infringe the '529 patent.

---

[2] Prior art is "[k]nowledge that is publicly known, used by others, or available on the date of invention to a person of ordinary skill in an art, including what would be obvious from that knowledge. Prior art includes (1) information in applications for previously patented inventions; (2) information that was published more than one year before a patent application is filed; and (3) information in other patent applications and inventor's certificates filed more than a year before the application is filed. The U.S. Patent and Trademark Office and courts analyze prior art before deciding the patentability of a comparable invention." *Black's Law Dictionary* 126-27 (9th ed. 2009).

**The '529 Patent Is Invalid as Obvious**

57.     The '529 patent, titled "External preparation for application to the skin containing lidocaine," was issued on October 27, 1998, from an application filed on June 10, 1994. That application was a continuation of an application filed on March 30, 1992.

58.     The '529 patent claims foreign priority to Japanese Application No. 3-067353, filed March 30, 1991. It contains six claims directed generally to a hydrogel transdermal patch containing the active ingredient lidocaine and inactive ingredients or excipients.

59.     Claim 1 of the '529 patent claims a patch comprising "a drug-retaining layer placed on a support," in which the drug-retaining layer comprises an "adhesive gel base and 1 to 10% by weight of lidocaine." The claimed "adhesive gel base" consists of three components within specific percentage weight ranges: (i) "0.5 to 50% by weight of a water-soluble high molecular weight substance"; (ii) "30 to 70% by weight of water"; and (iii) "1 to 70% by weight of a water-retaining agent."

60.     The same hydrogel transdermal patch technology claimed in the '529 patent was disclosed in several pieces of prior art which were not disclosed to the patent examiner. Each of the following pieces of prior art discloses a hydrogel transdermal patch formulation substantially similar to that claimed in the '529 patent, except for the active pharmaceutical ingredient:

(a)     Japanese Unexamined Patent Application Publication S63-51330, titled "Steroid-Containing External Adhesive Agent," issued to Teikoku Seiyaku on March 4, 1988;

(b)     Japanese Unexamined Patent Application Publication S63-51333, titled "Deprodone Propionate-Containing External Adhesive Agent," issued to Teikoku Seiyaku on March 4, 1988;

(c)     European Patent Application Publication No. 0280737, titled "Steroidal drug-containing preparation for external use," filed on August 20, 1987 and published on September 7, 1988;

(d)     Japanese Unexamined Patent Application Publication 63-104913, titled "Adhesive Patch for External Use," issued on May 10, 1988;

(e)     Japanese Unexamined Patent Application Publication 63-238017, titled "Water-Based Adhesive Patch for External Use Containing Carteolol Hydrochloride," issued on October 4, 1988; and

(f)     U.S. Patent No. 5,082,663, titled "External adhesive preparation containing steroids," issued on January 21, 1992 from U.S. Application No. 07/639,758, filed on January 11, 1991 (a continuation of U.S. Application No. 07/189,313, filed on April 20, 1988), which lists the 35 U.S.C. §102(e) date as April 20, 1988.

Collectively, this prior art is referred to as the "Teikoku Prior Art."

61.     Each of these references qualifies as prior art to the '529 patent because it was publicly available and accessible more than one year before the March 30, 1991 priority date of the '529 patent.

62.     Each of the pieces of Teikoku Prior Art discloses an "adhesive gel base" consisting of (i) a water-soluble high molecular weight substance; (ii) water; and (iii) a water-retaining agent, all of which fall within the percentage ranges claimed in the '529 patent.

63.     Each of the pieces of Teikoku Prior Art discloses examples of the ingredients used in the adhesive gel base that are the same as those disclosed in the '529 patent.

64.     Each of the pieces of Teikoku Prior Art shares at least one inventor with the '529 patent. The prior art also shares the same applicant, prosecuting attorneys or assignee with the '529 patent. Thus, Teikoku was fully aware of the Teikoku Prior Art.

65.     During the prosecution of the '529 patent, the PTO rejected the patent five times, noting that because lidocaine was conventionally used in transdermal patches, it would have been obvious to place lidocaine into available prior art patches. Over several years, through each rejection, the PTO cited prior art patches other than the Teikoku Prior Art. The applicants consistently distinguished the prior art patches cited by the examiner, arguing that the patch in the '529 patent was "unique." The applicants never disclosed the Teikoku Prior Art to the PTO, including Teikoku's own prior art patent on the same patch technology that was the subject of the '529 patent, which would have shown that the patch technology in the '529 patent was not unique, and in fact had been previously patented. The Teikoku Prior Art was not cumulative of the prior art

cited by the PTO, and the applicants would not have overcome the rejections if they had disclosed the Teikoku Prior Art to the PTO.[3]

66.     Another item of invalidating prior art is U.S. Patent No. 4,695,465 (the "'465 patent"), which disclosed a patch with the same elements as the '529 patent, a water-soluble polymer, a water retaining agent, and water, and also listed lidocaine as a drug substance that can be used in the patch in the same concentration range as disclosed in the '529 patent. The applicants never disclosed the '465 patent to the PTO. It was not cumulative of the prior art cited by the PTO, and the applicants would not have overcome the rejections if they had disclosed the '465 patent to the PTO.

67.     Each of the prior art references discussed above predates the priority date of the '529 patent by over a year, and thus invalidates the '529 patent.

**The '529 Patent Does Not Cover Lidoderm and Is Not Infringed by Watson's Generic Lidoderm**

68.     In addition to being invalid as obvious, the '529 patent did not cover Lidoderm and is not infringed by Watson's generic equivalent. The patch formulation disclosed in the '529 patent includes a water soluble high molecular weight substance, water, and a water-retaining agent. The water soluble high molecular weight substance and the water-retaining agent must be from the groups listed in the patent. The groups listed in the '529 patent are known as Markush groups. "'A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C.'" *Endo Pharm. Inc., et al.*

---

[3]     As described in a report by the United States Government Accountability Office, patent examiners are generally expected to process an average of 87 patent applications per year and have time quotas of a total of 19 hours to process each application from its filing through its final acceptance or rejection. These time quotas are reinforced by examiners' bonus compensation, which is largely tied to the number of applications processed to completion. The patent application process is an ex parte process in which patent examiners rely upon the information and candor of applicants. The vast majority of all patent applications are ultimately granted. *See* Christopher A. Cotropia, *et al.*, *Patent Applications and the Performance of the U.S. Patent and Trademark Office*, Richmond School of Law, Intellectual Property Institute, Research Paper No. 2013-01 (Feb. 26, 2013) (calculating that 89% of patent applications were approved in 2012), *available at* http://ssrn.com/abstract=2225781.

*v. Watson Lab., Inc.*, No. 10-cv-138, slip op. at 1 n.1 (D. Del. June 27, 2011) ("*Endo Pharm.* slip op") (quoting *Abbott Labs. v. Baxter Pharm. Prods.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003)).

69.     In the '529 patent, the first Markush group related to "a water-soluble high molecular weight substance selected from the group consisting of gelatin, starch, agar, mannan, alginic acid, polyacrylic acid, a salt of polyacrylic acid, dextrin, methylcellulose, methylcellulose sodium, carboxymethylcellulose, carboxymethylcellulose sodium, polyvinyl alcohol, polyvinyl pyrrolidone, copolymer of methyl vinyl ether and maleic anhydride, gum arabic, tragacanth, karaya gum and locust bean gum." The second Markush group related to "a water-retaining agent selected from the group consisting of ethylene glycol, diethylene glycol, polyethylene glycol, glycerin, sorbitol, martitol, propylene glycol and 1,3-butylene glycol."

70.     As the district court found in its *Markman* decision construing those two patent terms, Federal Circuit precedent from 2003 clearly established that both of the relevant Markush groups in the '529 patent were limited to one and only one of the listed alternatives.[4] *Endo Pharm.* slip op. at 1-2 n.1 (quoting *Abbott Labs.*, 334 F.3d at 1281). As the district court held:

> "[A]n indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Id.* at 1281. The Federal Circuit clarified, however, that 'such an indefinite article used in conjunction with a Markush grouping does not receive such latitude because a proper Markush group is limited by the closed language term 'consisting of.'" *Id.* Therefore, "although 'a' without more generally could mean one or more in an open-ended patent claim, 'a' with 'consisting of' in this case indicates only one member of a Markush group." *Id.* Likewise, in this case, the plaintiffs are limited to "a" meaning "one and only one" water soluble high molecular weight substance. During prosecution, the patentee chose to amend claim 1 by inserting a Markush group.

*Id.*

71.     The district court applied the same reasoning to the second Markush group in the '529 patent as the issue was exactly the same for that group. *Id.* at 2 n.2. Under Federal Circuit

---

[4] *Markman* hearings are pretrial claim construction hearings which routinely occur in patent cases.

precedent, the patent must be interpreted to cover a product which contains only one of the substances from each of the two Markush groups.

72.      Both Lidoderm and Watson's generic contain at least four water-soluble high molecular weight substances, and three water-retaining agents. Thus, they are outside the scope of the '529 patent. Given the clear Federal Circuit precedent, no other interpretation of the patent is objectively reasonable. As a result, the '529 patent does not cover Lidoderm, and is not infringed by Watson's generic. No reasonable litigant would, or could, have believed that Watson's generic Lidoderm product infringed the '529 patent.

73.      As alleged extensively above, the '529 patent is invalid as obvious over prior art, including the Teikoku Prior Art, and Endo and Teikoku knew it.

74.      As alleged extensively above, the '529 patent does not cover Lidoderm or Watson's generic Lidoderm product, and Endo and Teikoku knew it.

75.      Despite knowing that the '529 patent is invalid and does not cover Lidoderm or its generic equivalents, Endo and Teikoku sued Watson for infringement of the '529 patent. No reasonable litigant would have expected success on the merits of the litigation against Watson. Endo and Teikoku commenced the litigation against Watson solely to delay generic competition to Lidoderm.

**Teikoku Improperly Maintained the Listing of the '529 Patent in the Orange Book**

76.      Only those patents that cover the approved drug, or a method of using the drug, may be listed in the Orange Book. As alleged above, the '529 patent does not cover Lidoderm. At least by July 2003, when the Federal Circuit issued the decision in *Abbott Labs.*, 334 F.3d 1274, Teikoku knew, or had reason to know, that the '529 patent did not cover Lidoderm. As a result, the '529 patent did not meet the requirements for listing in the Orange Book because it did not claim Lidoderm or a method of use for Lidoderm. Endo and Teikoku also knew that by choosing to amend

the patent claim to include a Markush group in an attempt to overcome the PTO's rejections, they were precluded from relying on the doctrine of equivalents to establish infringement.

77. Because the '529 patent does not cover Lidoderm, Teikoku's maintenance of the listing of the '529 patent in the Orange Book was baseless. Additionally, because the '529 patent is invalid, and Teikoku knew it, Teikoku's listing of the '529 patent in the Orange Book was baseless. No reasonable pharmaceutical company in Teikoku's position would realistically believe that the '529 patent should properly be listed in the Orange Book as related to Lidoderm or that the '529 patent could be reasonably asserted against an ANDA applicant for generic Lidoderm. Teikoku maintained the listing of the '529 patent in the Orange Book for the sole and improper purpose of delaying generic entry into the Lidoderm market.

78. Teikoku's continued listing of the '529 patent, despite knowing it does not cover Lidoderm, has caused Watson and other generics to make certifications under Paragraph IV as to the patent, and has resulted in the entry of 30-month stays for Watson and other generics, thereby delaying FDA approval of generic Lidoderm.

**Defendants' Anticompetitive Pay-for-Delay Agreement**

79. On or about May 28, 2012, Endo, Teikoku and Watson entered into an agreement ending the patent litigation related to Lidoderm between Endo, Teikoku and Watson. Under the Agreement, Watson Laboratories, Inc., on behalf of itself and its affiliates, including its parent company, Actavis plc, agreed that it, and its affiliates, would delay launching its generic Lidoderm product until September 15, 2013, unless otherwise specifically authorized by the Agreement. Thus, Actavis plc has also agreed through its wholly-owned subsidiary, Watson Laboratories, Inc., to be bound by the terms and conditions of the Agreement.

80. As the *quid pro quo* for Watson's promise to delay entry of its generic Lidoderm product until September 15, 2013, Endo and Teikoku promised to pay Watson at least $96 million in

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE
TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 20 -

the form of branded Lidoderm at no cost to Watson in the amount of $12 million *per month* from January 1, 2013 through August 1, 2013. Watson was free to sell the branded product and retain the full proceeds of those sales. Additionally, Endo and Teikoku agreed to delay launching an authorized generic for up to 7.5 months following Watson's exclusive entry into the market, a promise which had a cash value to Watson in the hundreds of millions of dollars.[5] Endo and Teikoku's agreement not to launch an authorized generic meant that Watson would be the sole generic on the market for at least six months, and could therefore maintain a relatively high generic price and earn higher profits than it otherwise would have earned, all at the expense of Plaintiff and other generic purchasers.[6]

81. The total payment flowing from Endo and Teikoku to Watson had a cash value in the hundreds of millions of dollars, and had no explanation or justification other than to induce Watson to stay out of the Lidoderm market and share monopoly profits among Defendants. This large, unjustified reverse payment had no rational connection to, and far exceeds, any approximation of the costs of continuing the patent litigation, nor was the reverse payment fair consideration for any services provided from Watson to Endo or Teikoku.

82. Endo/Teikoku and Watson also knew and/or believed and intended that their Agreement would prevent other generic companies from launching their own generic Lidoderm before Watson did, thereby creating a bottleneck. As the first filer of an ANDA for generic Lidoderm, Watson may be entitled to market its generic Lidoderm for 180 days free from

---

[5] The agreement stipulated that Watson could market and sell a generic version of Lidoderm and Endo/Teikoku would refrain from competing with Watson by marketing and/or selling an authorized generic version until the earlier of "(i) seven and a half (7.5) months from the Start Date, and (ii) the Launch of any Third Party Generic Product in the Territory." Thus, Endo/Teikoku could have entered the market at any time that a third-party generic product also entered the market. Assuming Watson satisfied the requirements of the Hatch-Waxman Act and benefitted from the 180-day exclusivity period, Endo/Teikoku would have been able to enter the market sometime between six and seven and a half months after Watson began selling its generic lidocaine patch.

[6] Again, assuming Watson benefitted from the 180-day exclusivity period.

competition from other generic Lidoderm products. The operation of the Agreement between Endo/Teikoku and Watson is designed to block all other generic Lidoderm products from coming to market until on or after September 15, 2013, because, absent the circumstances discussed above, the FDA will not approve subsequently-filed ANDAs until Watson's exclusivity period has run, which will not occur until 180 days after Watson launches.

83. Endo/Teikoku knew that the Agreement precluded entry of Watson's generic Lidoderm product despite the fact that Watson's generic Lidoderm product did not infringe the '529 patent, or any other patent Teikoku owned, and that the '529 patent is invalid. Thus, the Agreement provided Endo and Teikoku with protection from competition that the '529 patent did not.

84. Absent Endo/Teikoku's unlawful payments, any agreement settling the patent litigation would have resulted in much less delay of Watson's generic entry than with the payment, such that Watson would have launched much earlier than September 2013.

85. Endo/Teikoku used the power of its purse as opposed to the strength of its patents to obtain the agreement of Watson not to launch its generic Lidoderm product. In light of the fact that a ruling that the '529 patent was invalid or did not cover Lidoderm or a generic version of Lidoderm would have eliminated any reasonable possibility of keeping generic versions of Lidoderm from the market, swiftly eradicating the vast majority of sales from Lidoderm, Endo/Teikoku agreed to share its monopoly rents with Watson as the *quid pro quo* for Watson's agreement not to compete with Endo/Teikoku in the Lidoderm market until September 15, 2013.

**Anticompetitive Purpose and Effect of the Scheme**

86. The overarching scheme alleged herein has enabled Defendants to: (a) delay and/or preclude the entry of less expensive generic versions of Lidoderm products in the United States; (b) delay and/or suppress the introduction of an authorized generic version of Lidoderm, which otherwise would have appeared on the market coincident with initial generic competition (and, at the

latest, at a significantly earlier time than 6 to 7.5 months after Watson launches in September 2013); (c) fix, raise, maintain or stabilize the price of Lidoderm products; (d) permit Endo/Teikoku to maintain a monopoly in the U.S. market for Lidoderm products; and (e) allocate 100% of the U.S. market for Lidoderm products to Endo/Teikoku.

87. But for the anticompetitive scheme, in whole or in part: (i) Watson would have received FDA approval and begun selling its generic version of Lidoderm as early as May 2, 2012, when the Hind patents expired; and (ii) an increasingly competitive market for Lidoderm products would have thereafter emerged as additional generic manufacturers entered the market. Watson would have launched prior to resolution of any litigation over the Rolf patents as those patents afforded no reasonable possibility of liability to Watson. And, absent the illegal payment, assuming the '529 Litigation was still filed, Endo, Teikoku and Watson would have entered an agreement under which Watson would have entered the market much earlier than September 2013.

**Watson Would Have Launched its Generic Lidoderm Upon FDA Approval Notwithstanding the Rolf Patents**

88. On or about June 29, 2011, Endo filed another suit against Watson in the United States District Court for the District of Delaware (*Endo Pharm. Inc. v. Watson Lab., et al.*, 11-cv-00575-GMS) (the "Rolf Patent Litigation"), alleging that Watson's generic Lidoderm product would infringe three of the Rolf patents, the '333 patent, the '334 patent, and the '510 patent. Only the '510 patent was ever listed in the Orange Book.

89. The '510 patent afforded no reasonable infringement threat for Watson. Of the three patents, it was the only one that previously had been asserted by LecTec against Endo with respect to its Lidoderm product in the LecTec Litigation in 2008. But, as Endo and Teikoku learned from the LecTec Litigation, the patent was subject to a strong challenge as being invalid as obvious, and even if valid and enforceable, the '510 patent likely did not cover Lidoderm and, therefore, would not be infringed by the drug. Nevertheless, despite this knowledge and its previous position that the '510

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 23 -

patent was invalid and would not be infringed by Lidoderm, Endo made an about-face and argued in the Rolf Patent Litigation that Watson's generic Lidoderm infringed the '510 patent.

90.    Watson was aware of Endo's inconsistent and contradictory stances on the '510 patent, and the infirmities of the '510 patent, even making many of the same arguments Endo previously made in the LecTec Litigation in defending against the Rolf Patent Litigation.

91.    The '333 and '334 patents also afforded no reasonable infringement threat for Watson. Indeed, LecTec had not even sued Endo for infringement of the '333 and '334 patents. When Endo ultimately settled the LecTec Litigation in November 2009, it obtained licenses only to the '263 and '510 patents. At that time, neither LecTec nor Endo believed that licenses to the '333 and '334 patents were relevant to the use, manufacture, or sale of Lidoderm. Watson's patch similarly would not infringe the '333 and '334 patents.

92.    Indeed, Endo did not obtain the rights to the '333 and '334 patents until May 2011, when it bought the rights to all of the Rolf patents from LecTec for just $2 million.

93.    Nonetheless, shortly after obtaining the '333 and '334 patents, Endo asserted three of the Rolf patents against Watson in a second lawsuit over Watson's generic Lidoderm product in June 2011.

94.    The Rolf patents were not listed in the Orange Book when Watson filed its ANDA. Thus, Watson was not required to certify to those patents under the Hatch-Waxman Act, and any litigation filed over those patents would not, and could not, result in a 30-month stay of FDA approval of Watson's ANDA. Thus, the Rolf Patent Litigation was no impediment to approval of Watson's ANDA. Once Watson obtained FDA approval of its ANDA, it was free to launch. Given the defects in the Rolf patents, Watson would have launched upon final FDA approval even in the absence of a court ruling on the Rolf patents, as they carried no reasonable threat of imposing infringement liability on Watson.

**Absent the Baseless Litigation Over the '529 Patent, Endo's Petition Would Not Have Delayed Watson's ANDA Approval**

95.    Watson received final FDA approval for its ANDA on August 23, 2012, on or about the same day that the FDA denied Endo's citizen petition.

96.    Endo filed its petition and amendments solely to interfere with Watson's and other generics' efforts to obtain FDA approval and not for any scientific or medical reasons. Endo filed its second amendment to the petition at the time that it did (March 2012) for the sole purpose of continuing to delay FDA approval of Watson's and/or other generic manufacturers' ANDAs.

97.    Endo was able to wait until March 2012 to file its second amendment to the petition because the 30-month stay of FDA approval of Watson's ANDA did not expire until July 2012, and there was little risk that the FDA would approve Watson's ANDA prior to the expiration of the stay. Endo did not cite or include any material fact in the March 2012 amendment that it could not have submitted earlier. Because Endo's motivation was delay, if the '529 patent had not been listed in the Orange Book, and/or Endo and Teikoku had not filed baseless litigation against Watson, Endo would have submitted its 2012 amendment much earlier than it did, and the FDA would have ruled on the petition earlier than it did. As a result, the FDA would have approved Watson's ANDA earlier to coincide with the expiration of the Hind patents on May 2, 2012.

98.    Endo's March 12, 2012 amendment was strategically timed to have the maximum disruptive impact on generic approval. By March 2012, the Lidoderm monopoly was in serious jeopardy. The last of the Hind patents were expiring on May 2, 2012. The trial on the '529 patent had concluded, and it had laid bare the lack of protection the '529 patent afforded Endo/Teikoku from generic competition. And the Rolf patents afforded no basis to delay approval of Watson's ANDA. There was a high probability that the FDA would rule on Endo's petition either upon the end of the expiration of the Hind patents in May 2012 or the end of the 30-month stay of Watson's ANDA in July 2012. Endo was also aware that Watson was telling Wall Street analysts in late 2011

and early 2012 that it was pursuing its ANDA based upon the 2006 FDA guidance, that it was closely monitoring the progress of the ANDA and expected approval in 2012, that its efforts to increase capacity were well underway, and it expected to be "ready to go at the earliest possible time to launch the product."[7] Thus, the timing of Endo's filing of its 45-page amendment in March 2012, with 14 separate requests for action by the FDA, had nothing to do with any new scientific, medical, safety or efficacy information; instead, it was timed to maximize FDA delay in addressing Endo's issues and to delay approval of Watson's ANDA.

99.     The fact that Endo filed its petition and amendments solely to interfere with Watson's and other generic manufacturers' efforts to obtain FDA approval and not for any scientific or medical reasons was made clear in the Agreement with Watson. In the Agreement, Endo and Teikoku promised not to submit any new filings to the FDA "that would prevent, delay, or otherwise hinder Watson's ability to obtain FDA approval" for its generic. Once Endo and Teikoku secured Watson's agreement not to enter the market until September 2013, the objective of delay had been achieved, and Endo and Teikoku no longer needed delay based upon Endo's petition. If Endo's purpose was for anything other than delaying generic competition, it would not have agreed to such a provision.

100.     Given that delay of FDA approval for generic Lidoderm ANDAs was Endo's true goal, absent the 30-month stay, Endo would have filed the March 2012 amendment much earlier to avoid the possibility that the FDA would have approved Watson's ANDA in advance of the May 2, 2012 expiration of the unchallenged Hind patents. Had Endo filed the amendment earlier, the FDA would have issued its August 23, 2012 decision earlier and would have approved Watson's ANDA earlier. And Watson would have launched upon approval.

---

[7]   *See* transcripts from Watson's third and fourth quarter 2011 earnings conference calls.

101. Defendants' unlawful actions have delayed or prevented the sale of generic Lidoderm in the United States, and unlawfully enabled Endo/Teikoku to sell Lidoderm at artificially inflated supracompetitive prices. But for Defendants' illegal conduct, generic competition to Lidoderm would have occurred already because one or more generic manufacturer would have already entered the market with its generic version of Lidoderm.

## MONOPOLY POWER AND MARKET DEFINITION

102. At all relevant times, Endo/Teikoku had monopoly power over Lidoderm products because it had the power to maintain the price of the drug it sold as Lidoderm at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Lidoderm, with the exception of AB-rated generic versions of Lidoderm.

103. A small, but significant, non-transitory price increase for Lidoderm by Endo/Teikoku would not have caused a significant loss of sales.

104. Lidoderm does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Lidoderm. Other drugs cannot be automatically substituted for Lidoderm by pharmacists, and thus are not economic substitutes for, nor reasonably interchangeable with, Lidoderm.

105. Lidoderm's pharmacological profile, and thus its side effect and efficacy profile, is different from other pharmaceuticals that are used to treat the same or similar conditions. Because of, among other reasons, its use and varying ability to treat pain associated with post-herpetic neuralgia, Lidoderm is differentiated from all products other than AB-rated generic versions of Lidoderm.

106. Endo/Teikoku needed to control only Lidoderm and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lidoderm profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Lidoderm would render

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE
TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 27 -

Endo/Teikoku unable to profitably maintain its current prices of Lidoderm without losing substantial sales.

107.    Endo/Teikoku also sold Lidoderm at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

108.    Endo/Teikoku have had, and exercised, the power to exclude and restrict competition to Lidoderm and AB-rated bio equivalents.

109.    At all relevant times, Endo/Teikoku enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

110.    To the extent that Plaintiff is legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant market is the market for Lidoderm products (*i.e.*, Lidoderm and its AB-rated generic equivalents) in the United States and its territories.  During the period relevant to this case, Endo/Teikoku has been able to profitably maintain the price of Lidoderm well above competitive levels.

111.    At all relevant times, Endo/Teikoku's market share in the relevant market was and remains 100%, implying a substantial amount of monopoly power.

## EFFECTS ON COMPETITION AND DAMAGES

112.    Watson's ANDA was approved August 23, 2012.  Absent Defendants' anticompetitive conduct alleged herein, one or more generic companies would have received FDA approval on or about May 2, 2012, and generic Lidoderm products would have entered the market on or shortly after that date.  In any event, one or more generic Lidoderm product would have entered the market at an earlier date than that provided in Defendants' Agreement, September 15, 2013.

113. But for the anticompetitive scheme alleged herein, an authorized generic version of Lidoderm would have been available on the market at an earlier time than 7.5 months after the launch of Watson's generic.

114. Defendants' scheme has delayed generic competition and unlawfully enabled Endo/Teikoku to sell Lidoderm without generic competition. But for Defendants' illegal conduct, one or more generic competitors would have begun marketing AB-rated generic versions of Lidoderm by May 2, 2012 or shortly thereafter. In any event, one or more generic Lidoderm product would have entered the market at an earlier date than that provided in Defendants' Agreement, September 15, 2013.

115. The generic manufacturers seeking to sell generic Lidoderm had extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs, marketing generic pharmaceutical products, manufacturing commercial launch quantities adequate to meet market demand, and, where appropriate, paying and receiving consideration for selective waiver and/or relinquishment of 180-day first-to-file marketing exclusivities.

116. Defendants' scheme, which delayed introduction into the United States marketplace of generic versions of Lidoderm, has caused Plaintiff and the Class to pay more than they would have paid for Lidoderm absent Defendants' illegal conduct.

117. Typically, generic versions of brand-name drugs are initially priced significantly below the corresponding brand-name drug to which they are AB-rated. As a result, upon generic entry, some or all of the purchases of brand-name drugs are rapidly substituted for generic versions of the drug. As more generic manufacturers enter the market, prices for generic versions of a drug predictably plunge even further because of competition among the generic manufacturers, and correspondingly, the brand-name drug continues to lose even more sales to the generics.

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 29 -

118.     This price competition enables all purchasers of the drugs to: (a) purchase generic versions of a drug at a substantially lower price, and/or (b) purchase the brand-name drug at a reduced price. Consequently, brand-name drug manufacturers have a keen financial interest in delaying the onset of generic competition, and purchasers experience substantial cost inflation from that delay.

119.     But for Defendants' anticompetitive scheme, in whole or in part, end-payors, such as Plaintiff and members of the Class, would have paid less for Lidoderm products by (a) substituting purchases of less-expensive AB-rated generic Lidoderm for their purchases of more-expensive branded Lidoderm, (b) receiving discounts on their remaining branded Lidoderm purchases, and (c) purchasing generic Lidoderm at lower prices sooner.

120.     Moreover, due to Defendants' anticompetitive scheme, other generic manufacturers were discouraged from and/or delayed in (a) developing generic versions of Lidoderm, and/or (b) challenging the validity or infringement of the Lidoderm patents in court.

121.     Thus, Defendants' unlawful conduct deprived Plaintiff and the Class of the benefits of competition that the antitrust laws were designed to ensure.

122.     During the relevant period, Plaintiff and other members of the Class purchased substantial amounts of Lidoderm indirectly from Endo/Teikoku and will purchase substantial amounts of generic Lidoderm indirectly from Watson. As a result of Defendants' illegal conduct as alleged herein, Plaintiff and other members of the Class were compelled to pay, and did pay, artificially inflated prices for their Lidoderm requirements. Plaintiff and the other Class members paid prices for Lidoderm that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Class members were deprived of the opportunity to purchase lower-priced generic Lidoderm instead of more expensive brand-name Lidoderm; (2) Class members paid artificially inflated prices for Lidoderm.

123. Consequently, Plaintiff and other members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## CLASS ACTION ALLEGATIONS

124. Plaintiff brings this action on behalf of itself and, under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, as representative of a Class defined as follows:

> All persons or entities in the United States and the District of Columbia and Puerto Rico who purchased and/or paid for some or all of the purchase price for branded and/or generic Lidoderm, in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class" or the "End-Payor Class"), other than for resale at any time during the period May 2, 2012, through the date the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

125. The following persons or entities are excluded from the proposed End-Payor Class:

(a) Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

(b) All governmental entities, except for governmental-funded employee benefit plans;

(c) All persons or entities who purchased Lidoderm or its AB-rated generic equivalent for purposes of resale or directly from Defendants or their affiliates;

(d) Fully insured health plans, *i.e.*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members;

(e) Any "flat co-pay" consumers whose purchases were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and

(f) The judges in this case and any members of their immediate families.

126. Members of the Class are so numerous that joinder is impracticable. Plaintiff believes the Class includes hundreds of thousands, if not millions, of consumers and thousands of third-party payors.

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 31 -

127. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they paid artificially inflated prices for Lidoderm and were deprived of the benefits of competition from less-expensive generic versions of Lidoderm as a result of Defendants' wrongful conduct.

128. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

129. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and have particular experience with class action antitrust litigation in the pharmaceutical industry.

130. Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

131. Questions of law and fact common to the Class include:

(a) whether Teikoku improperly listed and/or maintained the listing of the '529 patent in the Orange Book;

(b) whether Endo and Teikoku's patent infringement litigation against Watson was objectively baseless;

(c) whether Endo and Teikoku engaged in sham litigation to prevent competition;

(d) whether Defendants conspired to suppress generic competition to Lidoderm;

(e) whether, pursuant to the Agreement, Watson agreed to delay its entry into the market with generic Lidoderm;

(f) whether, pursuant to the Agreement, Endo and Teikoku compensated Watson;

(g)     whether Defendants' challenged conduct suppressed generic competition to Lidoderm;

(h)     whether Defendants' challenged conduct harmed competition in the market(s) in which Lidoderm is sold;

(i)     whether Endo possessed market or monopoly power over Lidoderm;

(j)     to the extent a relevant market or markets must be defined, what that definition is or those definitions are;

(k)     whether the activities of Defendants as alleged herein have substantially affected interstate and/or intrastate commerce;

(l)     whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Plaintiff and the members of the Class in the nature of overcharges; and

(m)     the quantum of overcharges paid by the Class in the aggregate.

132.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

133.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

# COUNT I

**Monopolization Under State Law**
**Against Defendants Endo and Teikoku**

134. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

135. At all relevant times, Endo and Teikoku possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Endo and Teikoku possessed the power to control prices in, prevent prices from falling in, and exclude competitors from, the relevant market.

136. Through the overarching anticompetitive scheme, as alleged above, Endo and Teikoku willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiff and the Class thereby.

137. It was Endo's and Teikoku's conscious objective to further their dominance in the relevant market by and through the overarching competitive scheme.

138. Endo and Teikoku's scheme harmed competition as aforesaid.

139. As a direct and proximate result of Endo's and Teikoku's illegal and monopolistic conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

140. By engaging in the foregoing conduct, Endo and Teikoku have intentionally and wrongfully maintained monopoly power in the relevant market in violation of the following state laws:

(a)     Arizona Rev. Stat. §44-1403, *et seq.*, with respect to purchases in Arizona by members of the Class;

(b)     Cal. Bus. & Prof. Code §17200, *et seq.*, and California common law with respect to purchases in California by members of the Class;

(c)     D.C. Code §28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class;

(d)     Fla. Stat. §501.201, *et seq.*, with respect to purchases in Florida by members of the Class;

(e)     740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class;

(f)     Iowa Code §553.5, *et seq.*, with respect to purchases in Iowa by members of the Class;

(g)     Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts;

(h)     Me. Rev. Stat. Ann. 10, §1102, *et seq.*, with respect to purchases in Maine by members of the Class;

(i)     Mich. Comp. Laws Ann. §445.773, *et seq.*, with respect to purchases in Michigan by members of the Class;

(j)     Minn. Stat. §325D.52, *et seq.*, and Minn. Stat. §8.31, *et seq.*, with respect to purchases in Minnesota by members of the Class;

(k)     Miss. Code Ann. §75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class;

(l)     Neb. Code Ann. §59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class;

(m)     Nev. Rev. Stat. Ann. §598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class;

(n)     N.M. Stat. Ann. §57-1-2, *et seq.*, with respect to purchases in New Mexico by members of the Class;

(o)     N.C. Gen. Stat. §75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class;

(p)     N.D. Cent. Code §51-08.1-03, *et seq.*, with respect to purchases in North Dakota by members of the Class;

(q)     Or. Rev. Stat. §646.705, *et seq.*, with respect to purchases in Oregon by members of the Class;

(r)     10 L.P.R.A. §260, *et seq.*, with respect to purchases in Puerto Rico by members of the Class;

(s)     R.I. Gen. Laws §6-36-5, *et seq.*, with respect to purchases in Rhode Island by members of the Class;

(t)     S.D. Codified Laws §37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class;

(u)     Utah Code Ann. §76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class;

(v)     Vt. Stat. Ann. 9, §2453, *et seq.*, with respect to purchases in Vermont by members of the Class;

(w)     W.Va. Code §47-18-4, *et seq.*, with respect to purchases in West Virginia by members of the Class; and

(x)     Wis. Stat. §133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class.

## COUNT II

### Conspiracy to Monopolize Under State Law
### Against Defendants Endo and Teikoku

141.  Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

142.  With regard to all conduct complained of above, at all relevant times, Endo acted in concert with Teikoku to maintain their monopoly power.

143.  At all relevant times, Endo and Teikoku possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Endo and Teikoku possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

144.  Through the anticompetitive scheme alleged herein, Endo and Teikoku conspired to maintain Endo's monopoly power in the relevant market in order to block and delay market entry of AB-rated generic versions of Lidoderm. The scheme allocated all sales of Lidoderm in the United States to Endo and Teikoku; delayed the sales of generic Lidoderm products; and fixed the price which Plaintiff and members of the Class would pay for Lidoderm products at the higher, branded price.

145.  The goal, purpose and/or effect of the scheme was to maintain and extend Endo and Teikoku's monopoly power in the U.S. market for Lidoderm. The scheme prevented and/or delayed generic competition to Lidoderm and enabled Endo and Teikoku to continue charging supracompetitive prices for Lidoderm without a substantial loss of sales.

146.  Endo and Teikoku knowingly and intentionally conspired to maintain and enhance Endo and Teikoku's monopoly power in the relevant market.

147.  Endo and Teikoku specifically intended that their scheme would maintain Endo and Teikoku's monopoly power in the relevant market, and injured Plaintiff and the Class thereby.

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE
TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 37 -

148.    Endo and Teikoku each committed at least one overt act in furtherance of the conspiracy.

149.    There is and was no legitimate, non-pretextual pro-competitive justification for Endo's and Teikoku's actions comprising the anticompetitive scheme that outweighs their harmful effect. Even if there were some conceivable justification, the scheme is and was broader than necessary to achieve such a purpose.

150.    As a direct and proximate result of Endo and Teikoku's concerted conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

151.    By engaging in the foregoing conduct, Endo and Teikoku intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of the following state laws:

(a)    Arizona Rev. Stat. §44-1402, *et seq.*, with respect to purchases in Arizona by members of the Class;

(b)    Cal. Bus. & Prof. Code §16700, *et seq.*, and Cal. Bus. & Prof. Code §17200, *et seq.*, with respect to purchases in California by members of the Class;

(c)    D.C. Code §28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class;

(d)    Fla. Stat. §501.201, *et seq.*, with respect to purchases in Florida by members of the Class;

(e)    740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class;

(f)    Iowa Code §553.3, *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Iowa by members of the Class;

1      (g)     Kan. Stat. Ann. §50-101, *et seq.*, with respect to purchases in Kansas by
2   members of the Class;

3      (h)     Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by
4   members of the Class, with thousands of Massachusetts end-payors paying substantially higher
5   prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially
6
7   within Massachusetts;

8      (i)     Me. Rev. Stat. Ann. 10, §1101, *et seq.*, with respect to purchases in Maine by
9   members of the Class;

10      (j)     Mich. Comp. Laws Ann. §445.772, *et seq.*, with respect to purchases in
11   Michigan by members of the Class;

12      (k)     Minn. Stat. §325D.52, *et seq.*, with respect to purchases in Minnesota by
13   members of the Class;
14

15      (l)     Miss. Code Ann. §75-21-3, *et seq.*, with respect to purchases in Mississippi by
16   members of the Class;

17      (m)     Neb. Code Ann. §59-802, *et seq.*, with respect to purchases in Nebraska by
18   members of the Class;

19      (n)     Nev. Rev. Stat. Ann. §598A.060, *et seq.*, with respect to purchases in Nevada
20   by members of the Class, in that thousands of sales of Lidoderm took place at Nevada pharmacies,
21   purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct;
22

23      (o)     N.M. Stat. Ann. §57-1-2, *et seq.*, with respect to purchases in New Mexico by
24   members of the Class;

25      (p)     New York General Business Law §340, *et seq.*, with respect to purchases in
26   New York by members of the Class;

27

28

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE
TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT                          - 39 -

(q)      N.C. Gen. Stat. §75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class;

(r)      N.D. Cent. Code §51-08.1-02, *et seq.*, with respect to purchases in North Dakota by members of the Class;

(s)      Or. Rev. Stat. §646.705, *et seq.*, with respect to purchases in Oregon by members of the Class;

(t)      10 L.P.R.A. §251, *et seq.*, with respect to purchases in Puerto Rico by members of the Class;

(u)      R.I. Gen. Laws §6-36-7, *et seq.*, with respect to purchases in Rhode Island by members of the Class;

(v)      S.D. Codified Laws Ann. §37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class;

(w)      Utah Code Ann. §76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class;

(x)      Tenn. Code Ann. §47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Lidoderm and AB-rated generic equivalents at Tennessee pharmacies;

(y)      Vt. Stat. Ann. 9, §2453, *et seq.*, with respect to purchases in Vermont by members of the Class;

(z)      W.Va. Code §47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class; and

(aa)     Wis. Stat. §133.03, *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Wisconsin by members of the Class, in that the actions and transactions

alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Lidoderm at Wisconsin pharmacies.

## COUNT III

### Conspiracy and Combination in Restraint of Trade Under State Law
### Against All Defendants

152.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

153.    In or about May 2012, and at times prior to the formal execution thereof, Defendants entered into the Agreement, a continuing illegal contract, combination and conspiracy in restraint of trade under which Endo and Teikoku agreed to pay Watson substantial consideration in exchange for Watson's agreement to delay bringing its generic version of Lidoderm to the market, the purpose and effect of which was to: (a) allocate 100% of the market for Lidoderm in the United States to Endo and Teikoku; (b) prevent the sale of generic versions of Lidoderm in the United States, thereby protecting Lidoderm from any generic competition for over a year; (c) delay the entry of an authorized generic by Endo and Teikoku until 7.5 months after Watson's entry into the market with a generic Lidoderm product; (d) fix, at supracompetitive levels, the price at which end-payors would pay for Lidoderm; and (e) create a bottleneck to prevent the FDA from approving any other ANDA for generic Lidoderm until after Watson's exclusivity period ends.

154.    The Agreement harmed Plaintiff and the Class as set forth above.

155.    The Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

156.    There is and was no legitimate, non-pretextual, pro-competitive justification for the payment from Endo and Teikoku to Watson that outweighs its harmful effect. Even if there were some conceivable justification, the payment was not necessary to achieve such a purpose.

157. As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

158. By engaging in the foregoing conduct, Defendants entered a conspiracy and combination in restraint of trade in violation of the following state laws:

(a) Arizona Rev. Stat. §44-1402, *et seq.*, with respect to purchases in Arizona by members of the Class;

(b) Cal. Bus. & Prof. Code §16700, *et seq.*, and Cal. Bus. & Prof. Code §17200, *et seq.*, with respect to purchases in California by members of the Class;

(b) D.C. Code §28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class;

(c) Fla. Stat. §501.201, *et seq.*, with respect to purchases in Florida by members of the Class;

(d) 740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class;

(e) Iowa Code §553.3, *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Iowa by members of the Class;

(f) Kan. Stat. Ann. §50-101, *et seq.*, with respect to purchases in Kansas by members of the Class;

(g) Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts;

(h) Me. Rev. Stat. Ann. 10, §1101, *et seq.*, with respect to purchases in Maine by members of the Class;

(i) Mich. Comp. Laws Ann. §445.772, *et seq.*, with respect to purchases in Michigan by members of the Class;

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE
TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 42 -

1         (j)     Minn. Stat. §325D.52, *et seq.*, with respect to purchases in Minnesota by

2 members of the Class;

3         (k)     Miss. Code Ann. §75-21-3, *et seq.*, with respect to purchases in Mississippi by

4 members of the Class;

5         (l)     Neb. Code Ann. §59-802, *et seq.*, with respect to purchases in Nebraska by

6 members of the Class;

7         (m)     Nev. Rev. Stat. Ann. §598A.060, *et seq.*, with respect to purchases in Nevada

8 by members of the Class, in that thousands of sales of Lidoderm took place at Nevada pharmacies,

9 purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct;

10         (n)     N.M. Stat. Ann. §57-1-2, *et seq.*, with respect to purchases in New Mexico by

11 members of the Class;

12         (o)     New York General Business Law §340, *et seq.*, with respect to purchases in

13 New York by members of the Class;

14         (p)     N.C. Gen. Stat. §75-2.1, *et seq.*, with respect to purchases in North Carolina

15 by members of the Class;

16         (q)     N.D. Cent. Code §51-08.1-02, *et seq.*, with respect to purchases in North

17 Dakota by members of the Class;

18         (r)     Or. Rev. Stat. §646.705, *et seq.*, with respect to purchases in Oregon by

19 members of the Class;

20         (s)     10 L.P.R.A. §251, *et seq.*, with respect to purchases in Puerto Rico by

21 members of the Class;

22         (t)     R.I. Gen. Laws §6-36-7, *et seq.*, with respect to purchases in Rhode Island by

23 members of the Class;

24         (u)     S.D. Codified Laws Ann. §37-1-3.2, *et seq.*, with respect to purchases in

25 South Dakota by members of the Class;

26         (v)     Utah Code Ann. §76-10-911, *et seq.*, with respect to purchases in Utah by

27 members of the Class;

28

(w)    Tenn. Code Ann. §47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Lidoderm and AB-rated generic equivalents at Tennessee pharmacies;

(x)    Vt. Stat. Ann. 9, §2453, *et seq.*, with respect to purchases in Vermont by members of the Class;

(y)    W.Va. Code §47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class; and

(z)    Wis. Stat. §133.03, *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Lidoderm at Wisconsin pharmacies.

## COUNT IV

### Attempted Monopolization Under State Law
### Against Defendants Endo and Teikoku

159.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

160.    Endo and Teikoku, through their overarching anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market. It was Endo's and Teikoku's conscious objective to control prices and/or exclude competition in the relevant market.

161.    The natural and probable consequence of Endo and Teikoku's overarching anticompetitive scheme, which was intended by, and plainly foreseeable to, Endo and Teikoku, was to control prices and exclude competition in the relevant market, to the extent it did not succeed.

162.    There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Endo and Teikoku would succeed in and achieve their goal of maintaining monopoly power in the relevant market.

163. As a direct and proximate result of Endo's and Teikoku's illegal and monopolistic conduct, Plaintiff and the Class were harmed as aforesaid.

164. By engaging in the foregoing conduct, Endo and Teikoku have intentionally and wrongfully attempted to monopolize the relevant market in violation of the following state laws:

      (a)      Arizona Rev. Stat. §44-1403, *et seq.*, with respect to purchases in Arizona by members of the Class;

      (b)      Cal. Bus. & Prof. Code §17200, *et seq.*, and California common law with respect to purchases in California by members of the Class;

      (c)      D.C. Code §28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class;

      (d)      Fla. Stat. §501.201, *et seq.*, with respect to purchases in Florida by members of the Class;

      (e)      740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class;

      (f)      Iowa Code §553.5, *et seq.*, with respect to purchases in Iowa by members of the Class;

      (g)      Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts;

      (h)      Me. Rev. Stat. Ann. 10, §1102, *et seq.*, with respect to purchases in Maine by members of the Class;

      (i)      Mich. Comp. Laws Ann. §445.773, *et seq.*, with respect to purchases in Michigan by members of the Class;

      (j)      Minn. Stat. §325D.52, *et seq.*, and Minn. Stat. §8.31, *et seq.*, with respect to purchases in Minnesota by members of the Class;

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 45 -

1         (k)     Miss. Code Ann. §75-21-3, *et seq.*, with respect to purchases in Mississippi by

2 members of the Class;

3         (l)     Neb. Code Ann. §59-802, *et seq.*, with respect to purchases in Nebraska by

4 members of the Class;

5         (m)    Nev. Rev. Stat. Ann. §598A.060, *et seq.*, with respect to purchases in Nevada

6 by members of the Class;

7         (n)     N.M. Stat. Ann. §57-1-2, *et seq.*, with respect to purchases in New Mexico by

8 members of the Class;

9         (o)     N.C. Gen. Stat. §75-2.1, *et seq.*, with respect to purchases in North Carolina

10 by members of the Class;

11        (p)     N.D. Cent. Code §51-08.1-03, *et seq.*, with respect to purchases in North

12 Dakota by members of the Class;

13        (q)     Or. Rev. Stat. §646.705, *et seq.*, with respect to purchases in Oregon by

14 members of the Class;

15        (r)     10 L.P.R.A. §260, *et seq.*, with respect to purchases in Puerto Rico by

16 members of the Class;

17        (s)     R.I. Gen. Laws §6-36-5, *et seq.*, with respect to purchases in Rhode Island by

18 members of the Class;

19        (t)     S.D. Codified Laws §37-1-3.2, *et seq.*, with respect to purchases in South

20 Dakota by members of the Class;

21        (u)     Utah Code Ann. §76-10-911, *et seq.*, with respect to purchases in Utah by

22 members of the Class;

23        (v)     Vt. Stat. Ann. 9, §2453, *et seq.*, with respect to purchases in Vermont by

24 members of the Class;

25        (w)    W.Va. Code §47-18-4, *et seq.*, with respect to purchases in West Virginia by

26 members of the Class; and

27        (x)     Wis. Stat. §133.03, *et seq.*, with respect to purchases in Wisconsin by

28 members of the Class.

# COUNT V

## Unjust Enrichment
## Against All Defendants

165.    Plaintiff realleges and incorporates the preceding allegations of this complaint with the same force and effect as if fully restated herein.

166.    Defendants have benefited from the overcharges on their sales of Lidoderm resulting from the unlawful and inequitable acts alleged in this complaint.

167.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Lidoderm by Plaintiff and members of the Class.

168.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Class.

169.    It would be futile for Plaintiff and the Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiff and the Class.

170.    It would be futile for Plaintiff and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Lidoderm, because those intermediaries are not liable and would not compensate Plaintiff and the Class for Defendants' unlawful conduct or the harm caused to Plaintiff and the Class by that unlawful conduct.

171.    The economic benefit that Defendants derived by charging supracompetitive and artificially inflated prices for Lidoderm is a direct and proximate result of Defendants' unlawful practices.

172.     The financial benefits that Defendants derived rightfully belong to Plaintiff and the Class, because Plaintiff and the Class paid anticompetitive prices during the Class Period, inuring to the benefit of Defendants.

173.     It would be inequitable under unjust enrichment principles under the laws of each of the States in the United States and the District of Columbia and Puerto Rico for the Defendants to be permitted to retain any of the overcharges for Lidoderm derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this complaint.

174.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Class.

175.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by Defendants.

176.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

177.     Plaintiff and the Class have no adequate remedy at law.

## COUNT VI

### Declaratory and Injunctive Relief Under §16 of the Clayton Act For Defendants' Violations of §1 and §2 of the Sherman Act Asserted Against All Defendants

178.     Plaintiff realleges and incorporates the preceding allegations of this complaint with the same force and effect as if fully restated herein.

179.     Plaintiff's allegations described herein and in the preceding Counts comprise violations of §§1 and 2 of the Sherman Act, in addition to the state laws, *supra*.

180.     Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §2201(a) hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates §§1 and 2 of the Sherman Act.

181.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to §16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief so as to assure that similar anticompetitive conduct does not reoccur in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare the Plaintiff as the representative of the Class;

B.    Declare that the conduct alleged herein is in violation of the statutes set forth above;

C.    Enjoin Defendants from continuing the illegal activities alleged herein and grant other equitable and injunctive relief as necessary to mitigate or prevent future anticompetitive effects of Defendants' conduct;

D.    Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

E.    Award the Class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

E.    Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment; and

F.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law.

# JURY DEMAND

Pursuant to Fed. Civ. P. 38, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

DATED: March 11, 2014

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
LONNIE A. BROWNE


                        /s/ Brian O. O'Mara
                      BRIAN O. O'MARA

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

CAVANAGH & O'HARA
PATRICK J. O'HARA
407 East Adams Street
Springfield, IL 62701
Telephone: 217/544-1771
217/544-9894 (fax)

Attorneys for Plaintiff

S:\CptDraft\Antitrust\CPT Lidoderm.docx

COMPLAINT FOR VIOLATION OF STATE ANTITRUST AND/OR UNFAIR AND DECEPTIVE
TRADE PRACTICES ACTS AND THE SHERMAN ANTITRUST ACT

- 50 -